**Electronically Filed
Supreme Court
SCWC-21-0000097
20-MAR-2026
08:12 AM
Dkt. 11 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

NAHO YAMAGUCHI,
Respondent/Plaintiff-Appellant,

vs.

TITLE GUARANTY ESCROW SERVICES, INC., a Hawai'i corporation,
Petitioner/Defendant/Cross-Claimant/
Third-Party Plaintiff-Appellee,

and

MARTELL CAPITAL GROUP, LLC, doing business as IRONGATE;
THE BLACKSTONE GROUP, L.P., a Delaware Limited Partnership,
Respondents/Defendants/Cross-Claim Defendants-Appellees,

and

PACREP LLC, a Delaware limited liability company,
Respondent/Third-Party Defendant.

SCWC-21-0000097

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-21-0000097; CASE NO. 1CC181000539)

MARCH 20, 2026

McKENNA, ACTING, C.J., EDDINS, GINOZA, AND DEVENS, JJ.,
AND CIRCUIT JUDGE JOHNSON, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY DEVENS, J.

## I.  INTRODUCTION

This case involves a 2013 condominium sales contract (Sales Contract) between purchaser Naho Yamaguchi (Yamaguchi) and seller PACREP LLC (PACREP).  That Sales Contract incorporated a separate escrow agreement (Escrow Agreement) executed by PACREP and Title Guaranty Escrow Services, Inc. (Title Guaranty), the escrow company facilitating the condominium sale.  Title Guaranty was not a party to the Sales Contract, and Yamaguchi was not a party to the Escrow Agreement.  This appeal arises from Yamaguchi's claims against Title Guaranty for breach of contract and breach of fiduciary duty relating to the Escrow Agreement.

In February 2016, Yamaguchi defaulted on the Sales Contract after failing to make the closing payment on the purchase of a condominium unit in the Ritz-Carlton Residences, Waikiki Beach condominium development (Ritz-Carlton Waikiki).  The Escrow Agreement between PACREP and Title Guaranty, which did not incorporate the Sales Contract, provided, in pertinent part, that in the event of a purchaser's default,

> [e]scrow shall thereafter treat all funds of the purchaser paid on account of such purchaser's sales contract as funds of Seller and not as funds of the purchaser.  Thereafter, such funds shall be free of the escrow established by this Agreement and shall be held by Escrow for the account of Seller.  Upon written request by Seller, Escrow shall pay such funds to Seller, less any escrow cancellation fee.

(Emphases added.)  Separately, Section D.38 of the Sales

Contract provided that upon default, if Yamaguchi had already paid more than fifteen percent of the purchase price into escrow, PACREP was entitled to liquidated damages equaling fifteen percent of the sales price or the amount of damages PACREP incurred as a result of Yamaguchi's breach, whichever was greater.  At the time of default, Yamaguchi's escrow payments exceeded fifty percent of the purchase price.

Upon Yamaguchi's default, PACREP sent Yamaguchi notice of her breach.  PACREP then sent Yamaguchi two contract termination letters after Yamaguchi failed to cure her default.  The first termination letter, copied to Title Guaranty, informed Yamaguchi that PACREP had "elected to exercise its right, pursuant to Section D.38 of the Sales Contract, to terminate the Sales Contract and retain fifteen percent (15%) of the Total Purchase Price as liquidated damages."  (Emphases added and omitted.) The second termination letter, also copied to Title Guaranty, notified Yamaguchi that PACREP had "elected to exercise its right, pursuant to Section D.38 of the Sales Contract, to terminate the Sales Contract and retain all deposits pursuant to the Sales Contract."  (Emphases added and omitted.)  Both termination letters stated that PACREP was "hereby notifying Title Guaranty Escrow Services, Inc. to cancel escrow and to release said funds and accrued interest to Seller."  In April

2016, Title Guaranty disbursed the balance of Yamaguchi's deposit to PACREP.

Pursuant to the remedy provisions of the Sales Contract, Yamaguchi subsequently filed for arbitration against PACREP, contesting the amount PACREP refunded her from the escrow deposits. Yamaguchi was awarded damages on a conversion claim, less PACREP's entitlement to liquidated damages. PACREP satisfied the judgment.

Separately, Yamaguchi filed a complaint in the present action in the Circuit Court of the First Circuit (circuit court) against Title Guaranty, asserting breach of contract and breach of fiduciary duty claims.[1]

Title Guaranty moved for summary judgment on Yamaguchi's claims and Yamaguchi cross-moved for partial summary judgment. The circuit court granted Title Guaranty's motion, denied Yamaguchi's cross-motion, and awarded attorney fees to Title Guaranty.[2] Yamaguchi appealed to the Intermediate Court of Appeals (ICA), which affirmed the circuit court's order denying Yamaguchi's motion for partial summary judgment.[3] However, the

---

[1]    Yamaguchi also alleged claims of conversion and unfair or deceptive acts or practices (UDAP) in violation of Hawaiʻi Revised Statutes (HRS) Chapter 480.

[2]    The Honorable James H. Ashford presided.

[3]    The ICA also affirmed summary judgment in favor of Title Guaranty on Yamaguchi's conversion and UDAP claims.

ICA vacated summary judgment as to Yamaguchi's breach of contract and breach of fiduciary duty claims, after concluding there was a genuine issue of material fact as to whether Title Guaranty breached the Escrow Agreement and its fiduciary duty to Yamaguchi when it disbursed the entirety of her escrow deposit to PACREP.  Citing Hawai'i Revised Statutes (HRS) § 449-16 (2013), the ICA concluded that "Title Guaranty had 'the responsibility of a <u>trustee</u> for all moneys' it received from Yamaguchi."  (Emphasis added.)

We hold that Yamaguchi failed to raise a genuine issue of material fact as to whether Title Guaranty breached the Escrow Agreement.  Accordingly, we also hold that Yamaguchi failed to raise a genuine issue as to whether Title Guaranty breached its fiduciary duty under HRS § 449-16.

With respect to Yamaguchi's breach of contract claim, Title Guaranty had a legal obligation to follow the terms of the Escrow Agreement, to which Yamaguchi assented in the Sales Contract, and which Title Guaranty fulfilled.  Upon a purchaser's default, Title Guaranty was required, pursuant to the Escrow Agreement, to "<u>treat all funds of the purchaser</u> paid on account of such purchaser's sales contract <u>as funds of Seller</u>," and to "pay such funds to Seller" upon the seller's "written request."  (Emphases added.)

Yamaguchi defaulted.  PACREP sent the required written notices to Yamaguchi.  With the terms of the Escrow Agreement met, Title Guaranty released the entire escrow deposit to PACREP.  Thus, there is no genuine issue of material fact as Title Guaranty complied with the plain and unambiguous language of the Escrow Agreement.  Therefore, as to Yamaguchi's breach of contract claim, we vacate the ICA's decision and judgment and affirm the circuit court's order granting summary judgment for Title Guaranty.

As to Yamaguchi's claim that Title Guaranty breached its fiduciary duty, we also vacate the ICA's decision and judgment and affirm the circuit court's order granting summary judgment for Title Guaranty.  As an escrow depository, Title Guaranty owed a fiduciary duty to Yamaguchi for the deposits made.  However, Title Guaranty's fiduciary duty was to "'comply strictly with the provisions' of the parties' escrow agreement or instructions."  Hancock v. Kulana Partners, LLC, 145 Hawai'i 374, 383, 452 P.3d 371, 380 (2019) (quoting DeMello v. Home Escrow, Inc., 4 Haw. App. 41, 47, 659 P.2d 759, 763 (App. 1983)).  See also HRS § 449-1 (2013) (stating that acts by an escrow depository are to be performed "in accordance with the terms of the agreement between the parties to the transaction"); and HRS § 449-16 (explaining that an escrow depository "shall

have the responsibility of a trustee for all moneys, other consideration, or instruments received by it").

Title Guaranty strictly complied with the terms of the Escrow Agreement and, therefore, Title Guaranty did not breach its fiduciary duty to Yamaguchi. In reference to PACREP's first letter to Yamaguchi indicating its election to retain fifteen percent of Yamaguchi's deposit as damages, and PACREP's second letter indicating its election to retain all of Yamaguchi's deposit, the ICA concluded that Title Guaranty breached its fiduciary duty after receiving "conflicting instructions from [PACREP] before it disbursed Yamaguchi's funds." Even if the two letters were interpreted to be in conflict, read in the light most favorable to Yamaguchi, the Escrow Agreement clearly and unambiguously stated that in the event of a purchaser's default, Title Guaranty was required to treat "all funds" in escrow as property of the seller, and that "such funds shall be free of the escrow established by this Agreement." Thus, PACREP's two termination letters did not conflict with the relevant, controlling provision of the Escrow Agreement with which Title Guaranty complied.

Yamaguchi also appealed the circuit court's award of attorney fees and costs to Title Guaranty, which the ICA did not reach after concluding that Title Guaranty was no longer the

7

prevailing party.  Title Guaranty does not raise attorney fees on certiorari.  Because the issue of attorney fees is not properly before this court, we remand the case to the ICA to determine whether the circuit court abused its discretion in awarding attorney fees and costs to Title Guaranty.

## II.  BACKGROUND

### A.  Escrow Agreement

The Escrow Agreement was executed by PACREP and Title Guaranty in February 2013.

Section C of the Escrow Agreement's "Recitals" provided:

> Seller intends to enter into sales contracts for the sale of units in the Project under the Public Report, the terms of which sales contracts will provide for payment of the purchase price and closing costs to be made to Escrow, to be held and disbursed by Escrow pursuant to the terms and provisions of this Agreement.

Pursuant to the Escrow Agreement, Title Guaranty was to "receive, deposit and hold in escrow and disburse . . . all payments received by Escrow under sales contracts made by Seller[.]"

In the event of a purchaser's default, Section 12 of the Escrow Agreement stated in relevant part:

> If Seller subsequently certifies in writing to Escrow that Seller has terminated the sales contract in accordance with the terms thereof and provides to Escrow copies of all such notices of termination and proof of receipt sent to the purchaser, Escrow shall thereafter treat all funds of the purchaser paid on account of such purchaser's sales contract as funds of Seller and not as funds of the purchaser.  Thereafter, such funds shall be free of the escrow established by this Agreement and shall be held by Escrow for the account of Seller.  Upon written request by

8

Seller, <u>Escrow shall pay such funds to Seller</u>, less any escrow cancellation fee. Escrow shall thereupon be released from any further duties or liability hereunder with respect to such funds and such purchaser.

(Emphases added.)

The Escrow Agreement further provided:

14. <u>Protection of Escrow</u>. In consideration of Escrow acting as escrow holder hereunder, it is agreed that Escrow is relieved from all liability for acting in accordance with the terms hereof, notwithstanding a notice to the contrary by Seller or any purchaser or third person[.]

. . . .

15. <u>Binding Effect</u>. <u>This Agreement shall be binding upon, shall apply to and shall inure to the benefit of the parties hereto</u> and their respective heirs, devisees, personal representatives, successors in trust, and assigns, <u>and shall upon its acceptance by a given purchaser</u> (which shall automatically occur upon Seller's execution of a sales contract), <u>also be binding upon and inure to the benefit of such purchaser</u>, his or her heirs, personal representatives, devisees, successors and permitted assigns.

(Emphases added.)

## B.   Sales Contract to Purchase Ritz-Carlton Waikiki Condominium Unit

In September 2013, Yamaguchi entered into the Sales Contract with PACREP to purchase Unit 1215 (Unit) in the Ritz-Carlton Waikiki for a sale price of $1,182,800.00, to be paid in installments.

Section 13 of the Sales Contract provided that the Escrow Agreement between Title Guaranty and PACREP would be incorporated into the Sales Contract, stating, in relevant part,

<u>Seller has entered into the Escrow Agreement with Escrow, which by this reference is incorporated herein and made a part hereof, covering the deposit with Escrow of all funds paid by Purchaser under this Sales Contract and the</u>

disbursement of such funds by Escrow. All payments to be made hereunder, other than the Initial Deposit made through the Project Broker, shall be paid by Purchaser to Escrow pursuant to the Escrow Agreement. Purchaser hereby acknowledges that Purchaser has examined and approves the terms of the Escrow Agreement, and hereby assumes the benefits and obligations set forth therein. . . .

            . . . .

. . . SELLER AND PURCHASER HEREBY IRREVOCABLY INSTRUCT ESCROW TO MAKE DISBURSEMENTS FROM PURCHASER'S DEPOSITS AS MAY BE PERMITTED BY THE ESCROW AGREEMENT. SELLER AND PURCHASER HEREBY AGREE THAT ESCROW IS RELIEVED FROM ALL LIABILITY FOR ACTING IN ACCORDANCE WITH THE TERMS OF THIS SECTION, NOTWITHSTANDING A NOTICE TO THE CONTRARY BY SELLER, PURCHASER, OR ANY OTHER PARTY OR THIRD PERSON; PROVIDED, HOWEVER, THAT ESCROW SHALL NOT BE RELIEVED FROM ANY LIABILTY ARISING OUT OF OR IN CONNECTION WITH ITS OWN INTENTIONAL, GROSS NEGLIGENCE, OR RECKLESS ACTS OR OMISSIONS.

(Emphases added and omitted.)

Section D.38 of the Sales Contract provided that in the event of a purchaser's default, the seller's remedies were, in relevant part, as follows:

In the event purchaser . . . shall fail to comply with or perform any of the covenants, agreements or other obligations to be performed by purchaser under the terms and provisions of this sales contract, . . . seller shall provide purchaser with written notice of such default or breach and the opportunity for purchaser to remedy such default or breach within twenty (20) days after the date of receipt of such notice. If purchaser has not remedied such default or breach within such twenty (20)-day period, seller shall be entitled to any remedy available in law or in equity including . . . termination of this sales contract upon written notice to purchaser . . . . [I]f purchaser loses its rights and interest in the unit as a result of purchaser's breach or default under this sales contract after fifteen percent (15%) of the purchase price has been paid by purchaser, (exclusive of any interest accrued thereon), seller shall refund to purchaser any amount that remains after subtracting (A) fifteen percent (15%) of the purchase price of the unit (exclusive of any interest earned thereon), or the amount of damages incurred by seller as a result of such breach, whichever is greater, from (B) the amount paid by purchaser with respect to the

10

> purchase price of the unit, excluding any interest earned
> thereon.

(Capitalization altered.)

## C.    Yamaguchi's Default

In 2016, Yamaguchi defaulted under the Sales Contract. Prior to defaulting, Yamaguchi had deposited approximately $592,400.00 into escrow, which was substantially greater than fifteen percent of the purchase price of the Unit.

On February 2, 2016, PACREP sent Yamaguchi a letter, with Title Guaranty copied, notifying Yamaguchi of her default and warning that

> [p]ursuant to Section D.38 of the Sales Contract, you have twenty (20) days from the receipt of this notice of default to remedy the default.  If you fail to close by said date, Seller may exercise any of its available remedies as set forth in Section D.38 of the Sales Contract.

(Emphases omitted.)

In a letter dated March 7, 2016 (March 7 Letter), PACREP sent a "Notice of Termination" to Yamaguchi, copied to Title Guaranty, stating in part:

> Because you failed to timely remedy the default, you are hereby notified that Seller has elected to exercise its right, pursuant to Section D.38 of the Sales Contract, to terminate the Sales Contract and retain fifteen percent (15%) of the Total Purchase Price as liquidated damages.
>
> By copy of this letter, we are hereby notifying Title Guaranty Escrow Services, Inc. to cancel escrow and to release said funds and accrued interest to Seller.

(Emphases added and omitted.)

Included with PACREP's March 7 Letter was an unsigned

11

"Termination Agreement and Mutual Release" noted as being by and between PACREP and Yamaguchi, communicating in part:

> Buyer and Seller agree that as soon as reasonably possible after the Termination Date, Escrow shall release to Buyer the amount that remains after subtracting (A) ONE HUNDRED SEVENTY SEVEN FOUR THOUSAND FOUR HUNDRED TWENTY AND NO/100 DOLLARS ($177,420.00) ("Seller's Payment") from (B) the Deposits, which totals FOUR HUNDRED FOURTEEN THOUSAND NINE HUNDRED EIGHTY AND NO/100 DOLLARS ($414,980.00) ("Buyer's Payment").

(Emphases omitted.)

In a letter dated March 25, 2016 (March 25 Letter), PACREP sent a second "Notice of Termination" to Yamaguchi, again copying Title Guaranty, declaring in part:

> Because you failed to timely remedy the default, you are hereby notified that Seller has elected to exercise its right, pursuant to Section D.38 of the Sales Contract, to terminate the Sales Contract and retain all deposits pursuant to the Sales Contract.
>
> By copy of this letter, we are hereby notifying Title Guaranty Escrow Services, Inc. to cancel escrow and to release said funds and accrued interest to Seller.

(Emphases added and omitted.)

Twelve days after the March 25 Letter, Title Guaranty disbursed $250,014.39 to PACREP on April 6, 2016. This disbursement represented the balance of Yamaguchi's escrow deposit, with the difference of approximately $592,400.00 of her total deposit having been previously disbursed to PACREP for permitted construction costs.

On March 31, 2016, Title Guaranty issued a letter to Yamaguchi, informing her that "[f]unds have been released to

seller as liquidated damages."  Shortly thereafter, Yamaguchi's counsel informed PACREP that she objected to the release of the funds.  Yamaguchi's counsel also sent a subsequent communication to Title Guaranty, inquiring as to the status of Yamaguchi's deposit.

D.   **Yamaguchi and PACREP's Arbitration Proceedings**

Pursuant to the arbitration provision in the Sales Contract, Yamaguchi submitted her dispute with PACREP to arbitration claiming: (1) recission of the Sales Contract under HRS Chapter 514B; (2) breach of contract; (3) conversion; (4) liquidated damages; and (5) unfair and deceptive acts or practices (UDAP) under HRS Chapter 480.  Yamaguchi prevailed on her conversion and UDAP claims.  The arbitrator awarded Yamaguchi: $412,750.90 in conversion damages; $1,000.00 in statutory damages and $5,000.00 in attorney fees related to her UDAP claim.  The arbitrator also awarded PACREP liquidated damages in the sum of $177,420.00, which was reflected in the net amount awarded to Yamaguchi.  The circuit court entered a final judgment confirming the arbitration award on September 25, 2018, and PACREP fully satisfied the judgment on October 12, 2018.[4]

---

[4]   The Honorable James H. Ashford presided.

13

**E.    Circuit Court Proceedings**

**1.    Yamaguchi's Complaint**

While Yamaguchi's arbitration claims against PACREP were pending, Yamaguchi filed a lawsuit in the circuit court against Title Guaranty.[5]  Relevantly, Yamaguchi alleged conversion (Count I); breach of fiduciary duty (Count II); breach of contract (Count III); and a UDAP claim (Count IV).

**2.    Title Guaranty's Motion for Summary Judgment**

On December 18, 2020, Title Guaranty filed a motion for summary judgment asserting that its sole duty was to comply with the Escrow Agreement, which it fulfilled by disbursing Yamaguchi's full escrow deposit to PACREP after PACREP provided Title Guaranty with the notice of termination of the Sales Contract following Yamaguchi's default.

Yamaguchi countered that the Escrow Agreement was unenforceable because she never signed it which violated the statute of frauds.  Further, Yamaguchi asserted there was a genuine issue of material fact as to whether she received the Escrow Agreement.  Yamaguchi also argued that Section 13 of the Sales Contract (incorporation section) was unintelligible, and

_____

[5]    Yamaguchi amended her circuit court complaint twice.  Yamaguchi's initial complaint also named Irongate, LLC (Irongate) and The Blackstone Group, L.P. (Blackstone Group).  Title Guaranty answered and filed a cross-claim against Irongate and Blackstone Group and a third-party complaint against PACREP.  These claims were later dismissed by stipulation.

Section 12 of the Escrow Agreement (escrow funds release section) was unconscionable and void as a matter of law.

### 3.   Yamaguchi's Motion for Partial Summary Judgment

Yamaguchi cross-moved for partial summary judgment on her conversion, breach of contract, breach of fiduciary duty, and UDAP claims.

### 4.   Circuit Court's Decision

Following a hearing, the circuit court granted Title Guaranty's motion for summary judgment on all counts and denied Yamaguchi's motion for partial summary judgment.

The circuit court reasoned:

> [N]umber one, plaintiff's sales contract with [PACREP] incorporates by reference and includes the terms of the escrow agreement between Title Guaranty and [PACREP].
>
> Number two, plaintiff defaulted on her obligations under that sales contract.
>
> Number three, despite plaintiff receiving notice of her default, plaintiff did not cure the default.
>
> Number four, pursuant to section D.38 of the sales contract, [PACREP] elected to terminate the sales contract and retain all of the money plaintiff had deposited with escrow.
>
> Number five, pursuant to paragraph 12 of the escrow agreement, [PACREP] instructed Title Guaranty to release all of plaintiff's deposited funds to [PACREP].
>
> And, number six, because all of the contractual preconditions to doing so were fulfilled, Title Guaranty had know [sic] choice but to follow the escrow instructions that plaintiff herself had agreed to and were incorporated and made a part of her sales contract.

The circuit court also found that Yamaguchi's claim that she never received the Escrow Agreement did not "nullify or

diminish her agreement to incorporate and make the escrow agreement a part of her sales contract[,]" and her assertion that it was not attached to the Sales Contract was "immaterial."

The court concluded that the Escrow Agreement was "incorporated into and made a part of the sales contract between [PACREP] and [Yamaguchi,]" finding that Yamaguchi "unambiguously incorporated the escrow agreement into her sales contract. She [did] not need to sign the escrow agreement to make it a part of her own contract."

The court further found Section 12 of the Escrow Agreement, which provided instructions regarding a purchaser's default, to be "applicable to the facts of this transaction in this case."

The circuit court concluded that "Title Guaranty did not breach any duty whether in contract or in tort to plaintiff[,]" noting:

> Title Guaranty has presented evidence negating the elements of breach of duty, both in tort and in contract, and has demonstrated that plaintiff will not be able to carry her burden of proof at trial. In response, plaintiff has done nothing to show any genuine issue of material fact with respect to either of Counts 2 or 3.

The court also granted Title Guaranty's motion for summary judgment as to Yamaguchi's conversion and UDAP claims, finding that Yamaguchi did not satisfy her burden.

The circuit court entered judgment for Title Guaranty and granted Title Guaranty's motion for attorney fees and costs

pursuant to HRS § 607-14 (2016).[6]

## F. ICA Proceedings

### 1. Opening Brief

Yamaguchi appealed the circuit court's grant of summary judgment for Title Guaranty and its denial of her motion for partial summary judgment. Yamaguchi raised eleven points of error. Relevant here, Yamaguchi argued that the circuit court erred in granting Title Guaranty's motion for summary judgment on her breach of contract and breach of fiduciary duty claims.

First, Yamaguchi asserted that the circuit court erred because Title Guaranty's fiduciary duty extended to her, even if she was not a signatory to the Escrow Agreement. She argued that Title Guaranty's duty "extended beyond the alleged escrow agreement that binds Yamaguchi" and required Title Guaranty to avoid self-dealing, conflicts of interest, and gross negligence or reckless acts or omissions.

Second, Yamaguchi asserted that she was "not a party to this Escrow Agreement" and "did not negotiate this Escrow Agreement"; and thus, the Escrow Agreement was illegal, unconscionable, unfair and deceptive, and, therefore, unenforceable.

---

[6] The ICA temporarily remanded the case for entry of an appealable judgment, and the circuit court entered an amended final judgment. Yamaguchi subsequently filed a First Amended Statement of Jurisdiction.

Yamaguchi also contended that the circuit court abused its discretion in awarding Title Guaranty attorney fees and costs.

## 2. Answering Brief

Title Guaranty contended that the circuit court did not err because, as an escrow, its only duty was to "comply strictly with the provisions of the [Escrow Agreement] or instructions." DeMello, 4 Haw. App. at 47, 659 P.2d at 763. Title Guaranty argued that Yamaguchi agreed to the Escrow Agreement's terms when she executed the Sales Contract, which expressly incorporated the Escrow Agreement.

Title Guaranty also maintained that the Escrow Agreement was neither illegal nor unenforceable. Pursuant to Section 12 of that agreement, it argued, "once [Title Guaranty] received [PACREP]'s certification in writing that the Sales Contract was terminated due to Yamaguchi's default, Yamaguchi's deposited funds automatically by irrevocable agreement became [PACREP]'s free of the escrow[.]" Accordingly, when Title Guaranty received the letter from PACREP, it continued, which "instructed [Title Guaranty] to release the deposited funds to [PACREP], [Title Guaranty] was required to do so under Section 12 of the Escrow Agreement." Title Guaranty contended there was no breach of its fiduciary or contractual duty because it complied with PACREP's instructions; further, the Escrow Agreement released

Title Guaranty from liability with respect to the escrow funds and "such purchaser."

Title Guaranty also argued that Yamaguchi's claims for conversion, UDAP, and punitive damages must fail and that the circuit court properly awarded Title Guaranty attorney fees.

### 3. Reply Brief

Yamaguchi replied that Title Guaranty breached its fiduciary duty because it was "fully aware of the conflict between the Sales Agreement and the Escrow Agreement." Yamaguchi contended that Title Guaranty was acting as a fiduciary for all the parties to the transaction. Therefore, Title Guaranty breached this duty when it released the funds to PACREP; failed to disclose to Yamaguchi material information related to the disbursement of the funds; and failed to maintain neutrality as the escrow agent.

Yamaguchi also reasserted her breach of contract claim, arguing that Title Guaranty breached the Escrow Agreement because the agreement favored the seller over the purchaser.

### 4. ICA Summary Disposition Order

The ICA affirmed the circuit court's order denying Yamaguchi's motion for partial summary judgment and the order granting summary judgment for Title Guaranty as to Yamaguchi's conversion and UDAP claims. However, the ICA vacated summary

judgment for Title Guaranty with respect to Yamaguchi's breach of contract and breach of fiduciary duty claims.

The ICA concluded there was a genuine issue of material fact as to whether Title Guaranty breached its fiduciary duty under HRS § 449-16 when it disbursed the entirety of the escrow funds to PACREP after PACREP sent "conflicting instructions" to Title Guaranty in the March 7 Letter and the March 25 Letter. The first letter, the ICA noted, instructed Title Guaranty to disburse fifteen percent of the purchase price, pursuant to Yamaguchi's default, while the subsequent letter instructed Title Guaranty to disburse all the escrow funds. Under Section D.38 of the Sales Contract, the ICA continued, if the purchaser deposited more than fifteen percent of the Unit's purchase price, upon the purchaser's default, PACREP was entitled to keep fifteen percent of the price. The ICA pointed out that after PACREP notified the parties of Yamaguchi's default, Title Guaranty disbursed all of Yamaguchi's funds even though she deposited more than fifty percent of the purchase price into escrow. "Under these circumstances," the ICA concluded, "there was a genuine issue of material fact about whether Title Guaranty breached its duty as a trustee of Yamaguchi's funds when it released all of her deposits to [PACREP]."

As to Yamaguchi's breach of contract claim, the ICA

20

determined that Yamaguchi was an intended third-party beneficiary of the Escrow Agreement, consistent with Section 15 of the agreement stating that the agreement shall be "binding upon and inure to the benefit of such purchaser" of a Ritz-Carlton Waikiki unit.  Thus, the ICA concluded: "[t]here is a genuine issue of material fact about whether Title Guaranty breached its contractual duty to Yamaguchi by paying all of her deposits to [PACREP]."

The ICA rejected Yamaguchi's remaining claims.  The ICA determined that: (1) "Yamaguchi wasn't a party to the Escrow Agreement[,]" meaning her argument regarding the "enforceability of section 12 has no bearing on the merits of her claims against Title Guaranty"; and (2) "Title Guaranty was not a party to the Sales Contract or otherwise in privity with [PACREP,]" rendering res judicata inapplicable.

The ICA vacated the circuit court's award of attorney fees and costs to Title Guaranty, concluding that Title Guaranty was "no longer the prevailing party."

The ICA denied Title Guaranty's motion for reconsideration.

**G.  Supreme Court Proceedings**

On certiorari, Title Guaranty raises two questions: (1) "[d]id the ICA err in holding that [Yamaguchi] was not a party to the [] Escrow Agreement"; and (2) "[d]id the ICA err in

holding that there were questions of fact as to whether Title Guaranty breached its contractual and fiduciary duties to Yamaguchi[.]"

As to the first question, Title Guaranty contends that Yamaguchi never argued that she was not a party to the Escrow Agreement. Title Guaranty also asserts that the ICA erred in sua sponte raising an issue not first considered by the circuit court. Moreover, Title Guaranty argues that because the Sales Contract incorporated the Escrow Agreement, Yamaguchi "assumed its benefits and obligations" and was therefore a party to the agreement.

With respect to the second question, Title Guaranty asserts two positions: (1) that Title Guaranty's only fiduciary duty was to "remain neutral" and "comply strictly" with the provisions of the Escrow Agreement and PACREP's instructions; and (2) Title Guaranty correctly complied with PACREP's second instruction (March 25 Letter) to disburse the entire deposit, which "superseded" PACREP's first instruction to disburse only fifteen percent of the purchase price.

Title Guaranty further posits that Yamaguchi's contention that she did not receive or understand the Escrow Agreement does not allow her to "escape [its] binding effect," and the circuit

court correctly found that she was bound by the agreement.

Title Guaranty also argues that escrow companies are not required to interpret contracts or advocate for escrow parties; they must remain "neutral" and comply strictly with the provisions of an agreement. Title Guaranty thus maintains that the ICA erred in concluding that the escrow company breached its duty to Yamaguchi after receiving "conflicting instructions" from PACREP regarding disbursal of the escrow funds. Because Section 12 of the Escrow Agreement provided that, in the event of default, escrow funds were to "be treated as the Seller's free of the escrow," and because it complied with PACREP's instructions, Title Guaranty asserts that it did not breach the Escrow Agreement or violate its fiduciary duty to Yamaguchi.

Based on the facts and circumstances of this case, we agree with Title Guaranty.

### III. STANDARDS OF REVIEW

#### A. Summary Judgment

We review the circuit court's grant or denial of summary judgment de novo. Jou v. Dai-Tokyo Royal State Ins. Co., 116 Hawai'i 159, 164, 172 P.3d 471, 476 (2007).

The standard for granting a motion for summary judgment is well-settled:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

> is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id. (cleaned up). In reviewing the evidence, "[t]he court is permitted to draw only those inferences of which the evidence is reasonably susceptible[.]" Ka'upulehu Land LLC v. Heirs and Assigns of Pahukula, 136 Hawai'i 123, 132, 358 P.3d 692, 701 (2015) (citing Winfrey v. GGP Ala Moana LLC, 130 Hawai'i 262, 270-71, 308 P.3d 891, 899-900 (2013)).

"This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it." Reyes v. Kuboyama, 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) (citations omitted).

B.   Contract Interpretation

"'As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court.'" Frederick A. Nitta, M.D., Inc. v. Hawaii Med. Serv. Ass'n, 156 Hawai'i 457, 470, 575 P.3d 547, 560 (2025) (citing Casumpang v. ILWU Local 142, 108 Hawai'i 411, 420, 121 P.3d 391, 400 (2005)).

> This court has determined that it is fundamental that terms of contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the

24

> contract indicates a different meaning.  Further, in
> construing a contract, a court's principal objective is to
> ascertain and effectuate the intention of the parties as
> manifested by the contract in its entirety.  If there is
> any doubt, the interpretation which most reasonably
> reflects the intent of the parties must be chosen.

Harrison v. Casa De Emdeko, Inc., 142 Hawai'i 218, 225, 418 P.3d

559, 566 (2018) (citation omitted).

## IV.   DISCUSSION

### A.   Breach of Contract

#### 1.   Yamaguchi was a third-party beneficiary of the Escrow Agreement.

Yamaguchi was not a signatory to the Escrow Agreement, but

she was clearly a third-party beneficiary of that agreement.

The ICA correctly concluded that Yamaguchi was entitled to

pursue her breach of contract claim as a third-party beneficiary

of the Escrow Agreement because the agreement was made expressly

for her benefit as a purchaser of a Ritz-Carlton Waikiki unit.

> A third party beneficiary is one for whose benefit a
> promise is made in a contract but who is not a party to the
> contract.  The rights of the third party beneficiary must
> be limited to the terms of the promise, and this promise
> may be express or it may be implied from the circumstances.

Ass'n of Apartment Owners of Newtown Meadows ex rel. its Bd. of

Directors v. Venture 15, Inc., 115 Hawai'i 232, 269, 167 P.3d

225, 262 (2007) (cleaned up).

"Ordinarily, third-party beneficiary status is a question

of fact as to whether the terms of the contract reflect an

intent to benefit the party."  Jou, 116 Hawai'i at 168, 172 P.3d

25

at 480 (cleaned up).

> In resolving the foregoing factual inquiry, this jurisdiction follows the framework set forth by the RESTATEMENT (SECOND) OF CONTRACTS § 302 (A.L.I. 1981), as follows:
>
> > (1) Unless otherwise agreed between promisor and promisee, <u>a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties</u> and either
> >
> > > (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> > >
> > > (b) <u>the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.</u>
> >
> > (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

<u>Id.</u> at 168–69, 172 P.3d at 480–81 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302 (A.L.I. 1981)) (cleaned up and emphases added).

As this court noted in <u>Title Guaranty Escrow Servs., Inc. v. Wailea Resort Co., Ltd.</u>, 146 Hawai'i 34, 46, 456 P.3d 107, 119 (2019), "'contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech.'" 146 Hawai'i at 46, 456 P.3d at 119 (citation omitted). In this case, pursuant to the Escrow Agreement, Title Guaranty was to "receive, deposit and hold in escrow and disburse . . . all payments received by Escrow under sales contracts made by Seller[.]" Section 15 of the agreement clearly provided that its terms would be "binding upon and inure to the benefit of

such purchaser" of the condominium units.

Based on a plain reading of the Escrow Agreement's unambiguous language, the agreement was clearly intended to benefit the purchasers of PACREP's Ritz-Carlton Waikiki units. Yamaguchi was an intended beneficiary of the Escrow Agreement, as were all purchasers of the Ritz-Carlton Waikiki units. This is further evidenced by Title Guaranty's role as an "escrow depository," as established by HRS § 449-1, which defines an "escrow depository" as "the corporation which, in an escrow, and for compensation, receives, holds, and delivers the money, other consideration, or instrument affecting title to real property." HRS § 449-1.

Given the terms and provisions of the Escrow Agreement, which expressly benefited purchasers of the units, the ICA did not err in concluding that Yamaguchi was an intended third-party beneficiary.

### 2. The ICA erred in concluding that there was a genuine issue of material fact as to whether Title Guaranty breached the Escrow Agreement.

As an intended third-party beneficiary of the Escrow Agreement, Yamaguchi had a right to pursue a breach of contract claim against Title Guaranty. "Generally, third parties do not have enforceable contract rights. The exception to the general rule involves intended third-party beneficiaries." Ass'n of

27

Apartment Owners of Newtown Meadows, 115 Hawai'i at 269, 167 P.3d at 262 (cleaned up).  However, "the rights of the third party beneficiary must be limited to the terms of the promise, and this promise may be express or it may be implied from the circumstances."  Id. (cleaned up).  Thus, Yamaguchi's right was limited to the terms of the Escrow Agreement, with which Title Guaranty complied.

The interpretation of a contract is reviewed de novo and "absent an ambiguity, the contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech."  Wailea Resort Co., Ltd., 146 Hawai'i at 45, 456 P.3d at 118 (cleaned up).  "As a general rule, the court will look no further than the four corners of the contract to determine whether an ambiguity exists."  Hawaiian Ass'n of Seventh-Day Adventists v. Wong, 130 Hawai'i 36, 45, 305 P.3d 452, 461 (2013) (citation omitted).

We note that although the Sales Contract incorporated the Escrow Agreement, the converse is not true; in other words, Section D.38 of the Sales Contract is not part of the Escrow Agreement.  Then, as further noted, Section 12 of the Escrow Agreement provides in pertinent part that in the event of a purchaser's default,

> [i]f Seller subsequently certifies in writing to Escrow that Seller has terminated the sales contract in accordance with the terms thereof and provides to Escrow copies of all

28

> such notices of termination and proof of receipt sent to the purchaser, Escrow shall thereafter treat all funds of the purchaser paid on account of such purchaser's sales contract as funds of Seller and not as funds of the purchaser. Thereafter, such funds shall be free of the escrow established by this Agreement and shall be held by Escrow for the account of Seller. Upon written request by Seller, Escrow shall pay such funds to Seller, less any escrow cancellation fee. Escrow shall thereupon be released from any further duties or liability hereunder with respect to such funds and such purchaser.

Based on the plain and unambiguous language of Section 12, the agreement authorizes Title Guaranty to disburse a purchaser's escrow deposit to PACREP, provided: (1) the purchaser defaults on the Sales Contract; (2) PACREP certifies in writing to Title Guaranty that it terminated the Sales Contract as a result of the default; and (3) PACREP provides Title Guaranty with copies of its termination notices and proof that the purchaser received the same.

There is no issue of material fact as to whether PACREP complied with Section 12 of the Escrow Agreement. Yamaguchi defaulted, and PACREP subsequently sent her a notice of default and two termination notices, all copied to Title Guaranty. Yamaguchi confirmed receiving PACREP's default and termination notices.

After Title Guaranty received the notices of termination from PACREP, Yamaguchi's escrow deposit was "free of the escrow established by [the Escrow Agreement]" and "held by Escrow for the account of Seller[,]" pursuant to Section 12 of the

agreement. Further, "[u]pon written request by Seller, Escrow [was obligated to] pay such funds to Seller, less any escrow cancellation fee." Title Guaranty received PACREP's written requests to return the funds by the March 7 Letter (requesting the return of fifteen percent of the deposit) and later the March 25 Letter (requesting the return of the entire deposit). Thus, after Yamaguchi defaulted, the governing and controlling provisions of the Escrow Agreement set the entirety of the deposit "free of the escrow," and dictated that the funds should be treated by Title Guaranty as PACREP's property. Acting in compliance with the clear and definite language of the Escrow Agreement, Title Guaranty disbursed Yamaguchi's deposit to PACREP. Yamaguchi had the option of enforcing the terms of the Sales Contract with respect to any portion of the proceeds she believed PACREP owed her from the escrow deposits. This is precisely what Yamaguchi did when she initiated arbitration proceedings against PACREP for those claimed amounts.

We hold that Yamaguchi did not meet her burden of establishing a genuine issue of material fact as to Title Guaranty's compliance with Section 12 of the Escrow Agreement. Title Guaranty complied with the Escrow Agreement by disbursing Yamaguchi's funds. Accordingly, the circuit court did not err in granting summary judgment in favor of Title Guaranty on

Yamaguchi's breach of contract claim.

3. **The ICA's conclusion that "Yamaguchi wasn't a party to the Escrow Agreement" is of no consequence to the ICA's analysis of Yamaguchi's breach of contract claim.**

Title Guaranty asserts that the ICA erred in determining Yamaguchi was not a party to the Escrow Agreement. However, with regard to the ICA's analysis of Yamaguchi's breach of contract claim now under review, Yamaguchi's status as a non-signatory to the Escrow Agreement is immaterial.

As stated, the ICA correctly concluded that Yamaguchi brought her contract claim as an intended third-party beneficiary of the Escrow Agreement. See supra Section IV.A.2. As a third-party beneficiary, Yamaguchi's breach of contract claim was "'limited to the terms of the promise[.]'" Ass'n of Apartment Owners of Newtown Meadows, 115 Hawai'i at 269, 167 P.3d at 262. As discussed above, Title Guaranty complied with the Escrow Agreement. Therefore, Title Guaranty's contention that the ICA erred in concluding Yamaguchi was not a party to the Escrow Agreement is of no consequence to our review of Yamaguchi's breach of contract appeal before us.

B. **Breach of Fiduciary Duty**

The ICA concluded that there was a genuine issue of material fact regarding Yamaguchi's breach of fiduciary duty claim based on PACREP's March 7 Letter and March 25 Letter that

31

issued purported "conflicting instructions" to Title Guaranty. We respectfully disagree.

Proving a breach of fiduciary duty requires plaintiff to show that: (1) a fiduciary relationship existed; (2) defendant breached their fiduciary duty to plaintiff; and (3) the breach was the proximate cause of plaintiff's injury.  See Awakuni v. Awana, 115 Hawai'i 126, 142 n.20, 165 P.3d 1027, 1043 n.20 (2007); Domingo v. James B. Nutter & Co., 153 Hawai'i 584, 615, 543 P.3d 1, 32 (App. 2023); 37 C.J.S. Fraud § 15 (2023).

Here, Title Guaranty had a fiduciary duty to both PACREP and Yamaguchi, who were parties to the Sales Contract.  Title Guaranty is an escrow depository as defined in HRS Chapter 449. See HRS § 449-1.  "Escrow" refers to

> any transaction affecting the title to real property, including leaseholds, proprietary leaseholds, and condominiums, in which a person not a party to the transaction and neither having nor acquiring any interest in the title receives from one party to the transaction, holds until the happening of an event or performance of a condition and then delivers to another party to the transaction, any money or other consideration or any instrument affecting the title to that real property, all

>in accordance with the terms of the agreement between the parties to the transaction.

Id. (emphasis added).  "Escrow depository" refers to "the corporation which, in an escrow, and for compensation, receives, holds, and delivers the money, other consideration, or instrument affecting title to real property."  Id.

HRS § 449-16(a) provides that an escrow depository "shall have the responsibility of a trustee for all moneys, other consideration, or instruments received by it."  HRS § 449-16(a) (2013) (emphasis added).

In DeMello, the ICA concluded that a fiduciary duty is clearly imposed by statute under HRS § 449-16, and "such duty is owed only to the parties to the escrow transaction."  4 Haw. App. at 47, 659 P.2d at 763.  There, the ICA noted, "[t]he statutory definition of 'escrow' specifically limits the depository's function to acts performed 'in accordance with the terms of the agreement between the parties to the transaction.'"  Id. (quoting HRS § 449-1).  This court cited approvingly to DeMello in Hancock, stating that "[t]he general rule is that an escrow depository occupies a fiduciary relationship with the parties to the escrow agreement or instructions[,]" and that the escrow company must "'comply strictly with the provisions' of the parties' escrow agreement or instructions."  Hancock, 145 Hawaiʻi at 383, 452 P.3d at 380 (citing DeMello, 4 Haw. App. at

33

47, 659 P.2d at 763).

In the case at bar, PACREP and Yamaguchi were the parties involved in the escrow transaction, and Yamaguchi was a third-party beneficiary of the Escrow Agreement. Title Guaranty therefore owed a fiduciary duty to Yamaguchi. DeMello, 4 Haw. App. at 47, 659 P.2d at 763. Title Guaranty's fiduciary duty was to "'comply strictly with the provisions' of the parties' escrow agreement or instructions." Hancock, 145 Hawai'i at 383, 452 P.3d at 380.

Once PACREP satisfied the requirements of Section 12 of the Escrow Agreement, the terms of the agreement further provided that the deposit "shall be free of the escrow established" by the Escrow Agreement. Title Guaranty's only duty thereafter was to adhere to the terms of the Escrow Agreement and "treat all funds of the purchaser paid on account of such purchaser's sales contract as funds of Seller" and "pay such funds to Seller" upon "written request by Seller[.]"

There is no genuine question of material fact as to whether Title Guaranty complied with Section 12 of the Escrow Agreement. As discussed, the March 7 Letter notified Yamaguchi and Title Guaranty that PACREP had "elected to exercise its right, pursuant to Section D.38 of the Sales Contract, to terminate the Sales Contract and retain fifteen percent (15%) of the Total

34

Purchase Price as liquidated damages." (Emphasis omitted.) Eighteen days later, PACREP sent the March 25 Letter informing Yamaguchi and Title Guaranty that PACREP had elected to "retain all deposits pursuant to the Sales Contract." (Emphasis added.) Both letters also stated that PACREP was "hereby notifying Title Guaranty Escrow Services, Inc. to cancel escrow and to release said funds and accrued interest to Seller." Title Guaranty complied and disbursed the balance of Yamaguchi's deposit to PACREP on April 6, 2016.

The ICA concluded that the instructions in PACREP's two letters were in conflict. The ICA explained that under one interpretation of Section D.38 of the Sales Contract, if Yamaguchi had paid more than fifteen percent of the purchase price into escrow--which she had--PACREP was only entitled to fifteen percent of the Unit's sale price as a result of Yamaguchi's default, with the balance to be refunded to the buyer. The ICA determined that under these circumstances, "there was a genuine issue of material fact about whether Title Guaranty breached its duty as a trustee of Yamaguchi's funds when it released all of her deposits to PACREP."

While the ICA correctly noted that "[u]nder one interpretation" of Section D.38, PACREP's entitlement to the deposit could be limited to only fifteen percent of the escrow

deposit, this interpretation of the Sales Contract has no bearing on Title Guaranty's fiduciary duty to Yamaguchi under the Escrow Agreement. But, as earlier noted, although the Sales Contract incorporated the Escrow Agreement, the Escrow Agreement did not incorporate the Sales Contract. Therefore, Section D.38 of the Sales Contract is not part of the Escrow Agreement. Hence, even if PACREP's two letters to Title Guaranty could be construed as containing "conflicting instructions," as opposed to superseding instructions, Title Guaranty's fiduciary duty was to "'comply strictly with the provisions' of the parties' escrow agreement or instructions." Hancock, 145 Hawai'i at 383, 452 P.3d at 380.

As noted, under Section 12 of the Escrow Agreement, Title Guaranty was obligated to "treat all funds of the purchaser paid on account of such purchaser's sales contract as funds of Seller and not as funds of the purchaser. . . . Upon written request by Seller, Escrow shall pay such funds to Seller[.]" (Emphases added.) Based on its plain and obvious meaning, "such funds" refers to "all funds of the purchaser paid on account of such purchaser[]." As there is no genuine issue of material fact as to Title Guaranty's compliance with Section 12 of the Escrow Agreement, we affirm the circuit court's order granting Title Guaranty summary judgment.

## V.   CONCLUSION

For these reasons, we vacate the ICA's December 19, 2024 judgment on appeal and remand the case to the ICA to address the award of attorney fees and costs.  The circuit court's January 25, 2022 Amended Final Judgment, January 13, 2021 order granting Title Guaranty summary judgment on all claims, and January 13, 2021 order denying Yamaguchi's partial summary judgment on all claims are affirmed.

Charles A. Price
for petitioner

Junsuke Aaron Otsuka
for respondent

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens

/s/ Ronald G. Johnson

